**VERTEX DEVELOPMENT, LLC, a Delaware Limited Liability Company, Plaintiff,**

v.

**MANATEE COUNTY, a Political Subdivision of the State of Florida, Defendant.**

**Case No. 8:09–CV–2645–T–17TBM.**

United States District Court, M.D. Florida, Tampa Division.

Jan. 3, 2011.

Mary D. Solik, Law Offices of John L. Di Masi, PA, Orlando, FL, for Plaintiff.

Robert M. Eschenfelder, Manatee County Attorney's Office, Bradenton, FL, for Defendant.

### ORDER ON SUMMARY JUDGMENT MOTIONS

ELIZABETH A. KOVACHEVICH, District Judge.

This cause is before this Court on:

Dkt. 13 Notice—Official Record, Hearing Video, Index

Dkt. 17 Notice—Hearing Transcript

Dkt. 20 Motion for Summary Judgment (Manatee County)

Dkt. 21 Motion for Summary Judgment (Vertex)

Dkt. 26 Response

Dkt. 27 Response

The Complaint in this case includes Count I, in which Plaintiff Vertex Development, LLC ("Vertex") seeks a declaratory judgment under the Telecommunications Act of 1996, 47 U.S.C. Sec. 332, and Count II, in which Plaintiff Vertex seeks a mandatory injunction under 47 U.S.C. Sec. 332.

Plaintiff Vertex and Defendant Manatee County have filed cross-motions for summary judgment.

I. Standard of Review

Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits,

show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

The plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The appropriate substantive law will guide the determination of which facts are material and which facts are ... irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. But, "[i]f the evidence is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505.

## II. Statement of Facts

1. Plaintiff Vertex Development, LLC is a Delaware corporation whose principal place of business is in Tampa, Florida. Plaintiff Vertex is in the business of providing service to various licensed wireless telecommunication providers by locating, leasing, zoning, constructing, and owning personal wireless service facilities.

2. Defendant Manatee County is a political subdivision of the State of Florida.

3. Plaintiff Vertex leased a parcel of land from River Club Golf Course, Inc., on which Plaintiff Vertex proposed to build a cellular telecommunications tower which would accommodate five wireless telecommunication providers. Plaintiff's anchor tenant was T–Mobile South, LLC.

4. River Club Golf Course is part of the larger River Club development. River Club Golf Course and Club House is owned and operated independently from the River Club Homeowner's Association. River Club is zoned Planned Development–Residential, and has a Res–1 Future Land Use Designation.

5. River Club Golf Course is a focal point of the design of River Club.

6. The Board of County Commissioners approved a Final Planned Development Plan for River Club Golf Course on December 17, 1987. (Dkt. 13, MC0381–MC0393).

7. On September 11, 1988, Manatee Joint Venture and River Club Golf Course, Inc. filed an Application for Development Approval of a Development of Regional Impact with the Manatee County Board of County Commissioners, which approved the Application on November 30, 1989 (Resolution R–89–243, Dkt. 13, MC0606–MC652). R–89–243 incorporated a Master Development Plan which provided for continuous development in subphases, in accordance with the subphase schedule incorporated therein by reference.

8. Manatee County adopted its Comprehensive Plan on May 11, 1989 (Manatee County Ordinance 89.01), pursuant to Ch. 163, *Fla. Stat.* The Manatee County Comprehensive Plan contains the long range policy structure for Manatee County. The purpose of the Manatee County Comprehensive Plan is to protect the public good for the long-term future of Manatee County. The Comprehensive Plan contains goals, objectives and policies on land use, transportation, environmental protection,

coastal protection, affordable housing, utility services and historic preservation.

9. Manatee County adopted its Land Development Code in 1990, pursuant to Sec. 163.3202, *Fla. Stat, et seq.* (Local Government Comprehensive Planning and Land Development Regulation Act), the general powers in Ch. 125, *Fla. Stat.*, and the Florida Constitution. The purpose of the Land Development Code is to implement the Comprehensive Plan of Manatee County by establishing regulations, procedures and standards for review and approval of all development and use of land in the unincorporated portions of Manatee County, and further to foster and preserve public health, safety, comfort and welfare in the unincorporated portions of Manatee County. Chapter 5 of the Land Development Code establishes development review procedures. Sec. 508 addresses site plans. Chapter 6 establishes zoning districts. Sec. 603 addresses planned development districts. Chapter 7 establishes development standards of general applicability. Sec. 704 addresses conditional use criteria. The Court takes judicial notice of the provisions of the Manatee County Comprehensive Plan and Manatee County Land Development Code.

Sec. 508, Land Development Code, provides:

**508.1.** *Purpose and Intent.* The purpose of site plan review is to ensure that development is carried out in compliance with this Code and the Comprehensive Plan. In addition, a site plan describing and portraying both existing and proposed conditions of the development is required in order that the approving body or official can make an informed decision.

**508.2.** *Applicability.* Pursuant to this Code, in certain circumstances a site plan may be required as part of a submitted application for development approval, or may, where authorized by this Code, be considered and approved as a separate step in the development process. An applicant has the option of proceeding directly to preliminary site plan approval without first obtaining approval of a General Development Plan. An applicant may be required to proceed directly to preliminary site plan approval where the Board determines a General Development Plan will not provide adequate detail to assure compliance with this Code and the Comprehensive Plan.

. . . .

**508.6.** *Factors for Reviewing Proposed Site Plans.* In deciding whether to recommend for approval, or approve, a proposed site plan, the Planning Commission, Board or Planning Director, as the case may be, shall consider whether the proposed site plan is consistent with the Comprehensive Plan and this Code. In determining whether such site plan is consistent with the Comprehensive Plan and this Code, the Planning Commission, Board and the Planning Director shall consider the following factors:

**508.6.1.** *Physical Characteristics of the Site; Relation to Surrounding Property . . . .*

. . . .

**508.6.4.** *Compatibility . . . .*

. . . .

**508.6.6.** *Design Quality . . . .*

**508.6.7.** *Relationship to Adjacent Property . . . .*

. . . .

**508.6.11.** *Natural and Historic Features . . . .*

. . . .

**508.6.13.** *Height . . . .*

. . . .

Sec. 603.1, Land Development Code, provides:

**603.1. *Purpose.*** Planned development districts are intended to be established where a proposed project warrants greater flexibility than a standard district provides; when the Comprehensive Plan requires a planned development review process; or when the ability to attach conditions to a site plan is warranted.

Planned development may be used as a vehicle to permit developments when the innovative use of buffering and modern design techniques mitigate the external impacts of development and create a helpful physical environment. Through the utilization of a planned district, the Board may allow mixed dwelling types and/or housing densities; provide for the safe, efficient, convenient, harmonious groupings of structures, uses, facilities, and support uses; for appropriate relationships of space, inside and outside buildings, for intended uses; for preservation of desirable natural features; and minimum disturbance of natural topography.

Within Planned Development Districts, regulations adapted to such unified planning and development are intended to accomplish the purposes of zoning and other applicable regulations to an equivalent or higher degree than where such regulations are intended to control unscheduled development on individual lots; to promote economical and efficient land use; improve levels of amenities for harmonious, creative design, and a better environment.

In view of the substantial public advantage of planned development, it is the intent of these regulations to promote and encourage development in this form, where appropriate, in location and character.

**603.2. *Planned Development, Defined.***

For purposes of this Code, a planned development is:

1. Land to be planned as a whole;

2. Built in a single development operation or a definitively programmed series of development operations;

3. To include principal and accessory structures and uses substantially related to the character and purposes of the district;

4. Built according to plans, which include not only streets, utilities, lots, building locations, and the like; but also, site plans for all buildings intended to be located, constructed, used and related to each other; and plans for other uses and improvements on the land as related to the buildings; and

5. To include a program to provide for operation and maintenance of such areas, facilities and improvements for common use by the occupants of the planned development district; but which will not be provided, operated or maintained at general public expense.

**603.3. *Relation of Planned Development Regulations to General Zoning, Subdivision or Other Regulations; Specific Approval to the Equal Satisfaction of Public Purposes.***

The planned development regulations which follow shall apply generally to the initiation of and regulation of all planned development districts.

**603.3.1.** Where there are conflicts between the special Planned Development regulations herein and general zoning, subdivision, other regulations or requirements; these Planned Development regulations shall apply in Planned Development districts unless the Board finds, in the particular case, that provisions herein do not serve public purposes to a degree at least equivalent to such general zoning, subdivision, or other regulations or requirements.

**603.3.2.** Where actions, designs or solutions proposed by the applicant are not literally in accord with applicable Planned Development or general regulations but the Board makes a written finding in the particular case, that the public purposes of these regulations are satisfied to an equivalent or greater degree, the Board may grant specific approval for the particular case . . . . .

**603.3.3.** Except as indicated above, and notwithstanding procedures and requirements generally in effect, the procedures and requirements set forth in this section shall apply in all Planned Development districts.

. . . .

**603.6. *Changes in Approved General Development Plan***

**603.6.1. *Requests for Change.*** All requests for review of changes to the General Development Plan shall include, a drawing indicating the property, a location drawing indicating the relationship of the portion to be revised with respect to the entire Planned Development district, if the revision does not include the entire Planned Development district; and such other information concerning the lot, adjoining lots, or other information to clearly represent the entire proposed change and any associated impacts upon the planned development and adjacent properties; and for determining whether the provisions of the district and this Code are being observed.

. . . .

**603.6.4. *New Plans Required.*** The following changes and similar changes, shall be considered substantial modifications requiring consideration of a new General Development Plan by the Planning Commission and Board of County Commissioners:

. . . .

2. Any change in use from the specifically approved use, except as listed in 603.6.2.1(11) . . . .

**603.7. *PDR—Planned Development Residential.***

**603.7.1. *Intent.*** It is the intent of these regulations to provide for development of residential areas in areas adequately served or in areas which can be served by necessary utilities and services, in locations that are compatible with adjacent and surrounding land uses in accord with the goals, objectives, and policies of the Comprehensive Plan and in compliance with the standards set forth herein.

It is further the intent to permit the establishment of such districts where planned development with carefully located buildings, parking and service areas and landscaped open space will provide for internal convenience and ease of use as well as external compatibility. It is further intended that PDR districts may provide a broad range of housing types appropriate to the general need of the area served.

Uses in PDR districts shall be consistent with Comprehensive Plan requirements regarding use, type, locational criteria and other applicable Comprehensive Plan criteria.

**603.7.4. *Specific and Review Criteria.***

**603.7.4.1. *Site Planning.*** Site planning within the district shall provide protection of the development from potentially adverse surrounding influences. The orientation of the development shall generally be toward internal streets and pedestrian systems and away from adjacent local streets and other adjacent land uses . . . .

. . . .

**603.7.4.4. *Neighborhoods.*** All Planned Residential Developments shall be designed in such a manner as to promote

neighborhoods. This shall be done by creating a neighborhood focal point within the development such as water-bodies, recreation areas or community centers.

Other methods of achieving neighborhood unity include: use of natural features, unified theme, use of greenbelts and pedestrian/bikeway corridors.

. . . .

**603.7.4.9.** *Building Height.* The maximum height in the PDRT District is thirty-five (35) feet. However, requests to increase height above thirty-five (35) feet may be approved by the Board of County Commissioners after review of the nature of surrounding uses, and the criteria listed in 603.7.4.9 below, upon the making of a specific finding that the proposed development is compatible with the surrounding area and will not created any external impacts that would adversely affect surrounding development, existing or proposed, waterfront vistas or entranceways.

1. *Compatibility.*

 a. Whether the height of the proposed development creates any external impacts that would adversely affect surrounding development, existing or proposed, waterfront vistas or entranceway areas.

2. *Relationship to Adjacent Properties.*

. . . .

 b. Whether the heights of buildings step down or otherwise provide an appropriate transition to adjacent properties.

. . . .

Sec. 701, Land Development Code, provides:

**701.1.** *Purpose.* The purpose of this Chapter is to provide development standards relating to specific land uses and natural or manmade features, wherever these are to be found. The regulations of this Chapter are intended to supplement, rather than supersede the district regulations found in Chapter 6 of this Code.

Sec. 704.59. *Personal Wireless Service Facilities.*

Purpose and Intent:

The purpose and intent of this section is to provide development standards relating to specific types of Personal Wireless Service Facilities (PWSF). The requirements established herein are deemed necessary by Manatee County to protect and enhance the community's environmental, economic and aesthetic quality, thereby contributing to the overall objective of promoting the health, safety and general welfare.

10. Sec. 704.59.2.B applies to Telecommunication Towers in all Planned Development Zoning Districts. Sec. 704.59.2(B)(2) provides:

In the event the telecommunications tower is not identified on an approved General Development Plan or approved Preliminary Site Plan as an allowed use, then the applicant is required to file an application to amend the applicable General Development Plan or Preliminary Site Plan. In such event, the amendment shall be reviewed during the public hearing process by the Planning Commission and the Board of County Commissioners. The criteria used by staff, the Planning Commission and the Board of County Commissioners shall be the general criteria for the processing of General Development Plans in Section 508.4 (Sections 508.4.1 through 508.4.2.3, LDC) and the criteria for processing a Preliminary Site Plan as set forth in Section 508.6 (508.6.1 through 508.6.25.4).

11. PDR 86–5(F) included approval of a golf course, club house and entrance

boulevard, within the larger 388 +/acre River Club development. PDR 86–5 also notes a recorded conservation easement.

12. Plaintiff Vertex filed its application to amend the General Development Plan of River Club Golf Course on May 21, 2009, to include the telecommunications tower as a permitted use.

13. On June 10, 2009, Plaintiff Vertex Development supplemented its application, in response to Manatee County's Application Completeness Letter.

14. Prior to a hearing before the Manatee County Planning Commission, Manatee County Planning Staff prepared a Staff Report recommending approval of Plaintiff's application.

15. The Manatee County Planning Commission heard Plaintiff's application at a duly noticed public hearing held on November 12, 2009.

16. At the hearing, Manatee County Staff recommended approval of Plaintiff's application, on the basis that Plaintiff's application was consistent with the Land Development Code and the Comprehensive Plan.

17. The Planning Commission, by a vote of 4–2, recommended that Plaintiff's application be denied.

18. On December 3, 2009, the Board of County Commissioners conducted a quasi-judicial hearing on Plaintiff's Application.

19. Manatee County Staff presented a Staff Report in which Manatee County Staff recommended approval, with stipulations. The Staff Report refers to the amending Ordinance as "approving a revised Zoning Ordinance and Preliminary Site Plan (PDR–86–05(P)(R2)) to be substituted for Zoning Ordinance PDR–86–05(P)(R) approved on December 17, 1987 to amend the allowable uses to include a 150' high telecommunications tower within River Club Golfcourse." (Dkt. 3–4, p. 4).

The Staff Report includes a brief history of the development of River Club:

*History*

River Club was rezoned to PDR–WP–ST on November 7, 1985 (Z–85–95) for approximately 388 +/acres. The Preliminary Development Plan for the Golf Course was approved on April 24, 1986 (PDR–86–05(P)) with the Final Development Plan (PDR–86–05(F)) approved on December 17, 1987 for approximately 388 +/acres and included an 18 hole Golf course, Clubhouse and a Driving Range. A revision to the Preliminary Development; Plan (PDR–86–05(P)(R)) was approved on March 24, 1988 with the Final Development Plan (PDR–86–05(F)(R)) on April 28, 1988.

The applicant is requesting a revision to the approved Preliminary Development Plan for River Club Golfcourse (PDR–86–05(P)(R2)). Staff received an application to locate a telecommunication tower on a leased portion within the boundary of River Club Golfcourse 33.3 +/campus. The applicant proposes to construct a 150' camouflaged telecommunication tower, equipment buildings and relocated 2 parking spaces to the south side of the existing parking lot. The tower has been camouflaged as a flag pole.

(Dkt. 3–4, p. 24).

20. The Staff Report notes the Planning Commission Action of 11/12/2009, in which the Planning Commission recommended denial. The Staff Report also notes Public Comment and Correspondence to the Planning Commission:

David Lunkes, Michael Murphy, Cecilia Harrison and Alex Troise, River Club residents, opposed the erection of the cell tower citing incompatibility, deed restriction requirements, the intention of the golf course to remain open space in perpetuity, insufficient buffers, and com-

mercial uses in close proximity to residential zoning. Gregory Gallagher, River Club resident, submitted a handout and expressed concern regarding the height and nature of the tower. Craig Harrison, River Club resident submitted sections of the LDC and a zoning map to support opposition of the tower and a commercial use in a residential zoning district.

(Dkt. 3–4, pp. 4–5).

The Court notes that e-mailed public comments express concern about depreciation of property values and safety risks associated with the presence of a cell tower. (Dkt. 3–4, pp. 54–141).

21. The Staff Report further notes positive aspects, negative aspects, and mitigating measures. The mitigating measures include:

1. The 150′ high camouflaged telecommunication tower is camouflaged as a flag pole.

2. The nearest residential lot is 353' to the west of the tower lease parcel.

3. Other developments have telecommunication towers within site (sic) distance of existing residential developments.

4. Telecommunication towers are permitted uses within the PDR zoning district.

5. The required landscape screening along the perimeter of the compound area should help make the tower base and equipment less obvious at ground level.

(Dkt. 3–4, p. 8). The Staff Report also includes a detailed discussion of how the Application meets the LDC Conditional Use Criteria for Telecommunication Towers (704.59(1)–704.59(4)). (Dkt. 3–4, pp. 9–24).

22. Plaintiff Vertex presented evidence on Plaintiff's Application at the hearing (Dkt. 13, MC0155–MC0589).

23. Residents of River Club appeared at the hearing and spoke in favor of and in opposition to Plaintiff's Application. Various residents submitted photographs, petitions, a DVD and other supporting documents for the views stated at the hearing (Dkt. 13, MC0596–MC01228).

24. Plaintiff Vertex addressed various issues in rebuttal to the opposition to Plaintiff's Application (Dkt. 17, pp. 6–42).

25. A motion was made to adopt Ordinance 09–69, denying Plaintiff's application (Dkt. 17, p. 43). The Board then posed questions about various issues, and discussed specific issues with Manatee County Staff. (Dkt. 17, pp. 43–53).

26. The Board of County Commissioners denied Plaintiff's Application, with a vote of 6–1, in adopting Ordinance 09–69.

27. Ordinance 09–69 includes the following Findings of Fact:

*Section 1.* ***FINDINGS OF FACT.*** The recitals set forth above are true and correct, and are hereby adopted as findings by the Board of County Commissioners. The Board of County Commissioners, after considering the testimony, evidence, documentation, the recommendation and findings of the Planning Commission, as well as all other matters presented to the Board at the public hearing hereinafter referenced, hereby makes the following findings of fact:

A. The Board of County Commissioners has received and considered the report of the Manatee County Planning Commission concerning the application for the Preliminary Site Plan and Conditional Use for a 150′ high camouflaged telecommunication tower on the real property described in Exhibit "A."

B. The Board of County Commissioners held a duly noticed public hearing on December 3, 2009 regarding the proposed Preliminary Site Plan and

Conditional Use described herein in accordance with the requirements of the Manatee County Land Development Code, and has further considered the testimony and evidence received at the public hearing.

C. The proposed Preliminary Site Plan and Conditional Use request for the 150' high camouflaged telecommunication tower regarding the property described in Exhibit "A" herein is found to be not consistent with the requirements of the Comprehensive Plan.

D. Based upon the evidence submitted into the public hearing record of the Planning Commission and the Board of County Commissioners, the Board of County Commissioners finds that the conditional use request does not comply with the criteria in Section 704.59 of the Land Development Code.

28. The entire Comprehensive Plan of Manatee County is part of the record before the Board of County Commissioners. (Dkt. 3–5, p. 4). Ordinance 09–69 also identifies the provisions of the Comprehensive Plan which the Board of County Commissioners considered relevant to support the Board's denial of approval of the Preliminary Site Plan and Conditional Use applications, and includes Findings of Fact relevant to the Comprehensive Plan provisions. (Dkt. 3–5, pp. 5–6).

29. The entire Land Development Code is part of the record before the Board of County Commissioners. Ordinance 09–69 identifies the provisions of the Land Development Code which the Board of County Commissioners considered relevant to the Board's denial of the Preliminary Site Plan and Conditional Use Applications, and includes Findings of Fact relevant to the Land Development Code provisions. (Dkt. 3–5, pp. 7–8).

30. Plaintiff Vertex filed the Complaint in this case on December 31, 2009.

III. Plaintiff's Motion

Plaintiff Vertex contends that Plaintiff Vertex has submitted uncontroverted evidence that T–Mobile has a coverage gap in the area and that the proposed tower site would fill in T–Mobile's coverage gap. Plaintiff Vertex avers that, during the December 3, 2009, hearing before the BOCC, the BOCC engaged in little or no debate or discussion of the merits of the application weighed against criteria set forth in Sec. 704.59 of the Manatee County LDC. Plaintiff Vertex argues that Commissioner McClash's articulated basis for the motion to deny was based on the Planning Commission's recommendation of denial, that the application failed to meet the original intent of the development approved for the River Club Community, and that the River Club Community is to be planned as a whole.

Plaintiff Vertex seeks both declaratory and injunctive relief pursuant to the Federal Telecommunications Act of 1996 ("TCA"), 47 U.S.C. Sec. 332(c)(7)(B)(iii). Plaintiff Vertex seeks a declaratory judgment that the denial of its application was void as violative of the TCA, and an injunction ordering Manatee County to approve the application as submitted in accordance with the TCA. The basis for the request for relief is founded upon Sec. 332(c)(7)(B)(iii) of the TCA, requiring that, "any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." Plaintiff Vertex alleges the BOCC violated the previously cited provision of the TCA when it denied Vertex's application for 150' cell tower without substantial evidence in the written record to support its decision. Defendant Manatee County responds that the Board had ample substan-

tial evidence before it upon which to rest its decision to deny the application.

## IV. General Principles

The Federal Telecommunications Act of 1996, 47 U.S.C. Sec. 332, provides for the promotion of competition and the reduction of regulation in the telecommunications industry, in order to secure lower prices and higher quality services for American telecommunications consumers and to encourage the rapid deployment of new telecommunications technology. Telecommunications Act of 1996, Pub. L. No. 104–104, purpose statement, 110 Stat. 56, 56 (1996). The Act accomplishes this in part through limitations, both procedural and substantive, placed upon local zoning authorities. 47 U.S.C. Sec. 332(c)(7). One such procedural limitation requires that "any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in the written record." 47 U.S.C. Sec. 332(c)(7)(B)(iii). Courts have observed that Sec. 332(c)(7)(B) is "a deliberate compromise between two competing aims—to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers." *U.S. Cellular v. City of Franklin, New Hampshire,* 413 F.Supp.2d 21, 29 (D. New Hampshire 2006) (citing to *Town of Amherst v. Omnipoint Commc'ns Enters. Inc.,* 173 F.3d 9, 13 (1st Cir.1999)).

The party seeking to overturn the decision reached by a local government bears the burden of proving that the decision was not based on substantial evidence. *Michael Linet, Inc. v. Village of Wellington,* 408 F.3d 757, 762 (11th Cir.2005). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol.*

*Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). While the "substantial evidence" standard is not as stringent as the preponderance of the evidence standard, it requires a court to take a harder look as compared to an arbitrary and capricious standard. *Color Pigments Mfrs. Ass'n, Inc. v. OSHA,* 16 F.3d 1157, 1160 (11th Cir.1994). Review under this standard is essentially deferential, such that courts may neither engage in their own fact-finding nor supplant a local zoning entity's reasonable determinations. *Cellular Telephone Co. v. Town of Oyster Bay,* 166 F.3d 490, 494 (2d Cir. 1999). The legitimate power of federal courts to interfere in the kinds of zoning decisions involved in cases such as these is clearly limited. *Aegerter v. City of Delafield,* 174 F.3d 886, 891–92 (7 th Cir.1999). Federal Courts are not free to substitute their own judgment for that of the board, even if they would decide the matter differently as an original matter. *360° Communications Company of Charlottesville v. Board of Supervisors of Albemarle County,* 211 F.3d 79, 84 (4th Cir.2000).

Plaintiff Vertex asserts that Manatee County's written decision set forth in Ordinance 09–69 establishes that the BOCC's decision is not supported by substantial evidence, as required by Sec. 332(c)(7)(B)(iii) of the TCA. Plaintiff Vertex contends that the findings within Ordinance 09–69 bear little relation to the actual application and request under review, the testimony in the record, and the basis on which the Board denied the application. As discussed below, the Court finds Plaintiff's contention to be unpersuasive and unfounded.

## V. Preliminary Issues

## 1. "In Writing" Requirement

It is not disputed that Ordinance 09–69 satisfies the "in writing" requirement of the TCA.

2. Scope of Defendant's Review Process

Plaintiff Vertex has argued that the decision of Defendant BOCC is limited to consideration of the conditional use criteria in Defendant's LDC. The Court does not agree.

■ This Court must accord the BOCC's fact-finding the same preclusive effect to which the BOCC would have been entitled in state court when the BOCC acts in a judicial capacity and the parties have had an adequate opportunity to litigate. *See University of Tennessee v. Elliott*, 478 U.S. 788, 799, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). Manatee County permits telecommunication towers within PDR districts subject to proof that certain facts and conditions as detailed in LDC 704.59 exist. The inclusion of a use as conditional in a particular zoning district establishes a *prima facie* case that the permitted use is in harmony with (i.e. compatible with) the general zoning plan. *See* LDC, Fig. 6–1, Community Service Uses. However, a finding of harmony with the general zoning plan is not *required*, but is merely permitted. *Wright v. Rockefeller*, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964). In *American Tower LP v. City of Huntsville*, 295 F.3d 1203, 1208 (11th Cir.2002), the Eleventh Circuit viewed the specific telecommunication tower regulations as conditions to be met before one can be considered for (but not entitled to) a special exception.

The BOCC's review of Plaintiff's application is site-specific. The Court notes that River Club, which includes River Club Golf Course, is zoned PDR. Under Manatee County's LDC, compatibility of a proposed development within an existing planned development with adjacent properties surrounding the proposed development is an appropriate consideration. The Court has included numerous provisions of Manatee County's LDC above which establish both the authority of the Board of County Commissioners to exercise discretion and the factors which guide the exercise of that discretion. There is no "one size fits all" solution to applications for development permits. Compliance with the requirements included in the conditional use criteria of Defendant Manatee County's LDC is the beginning of the story, not the conclusion. In any particular application, one factor may predominate over another, based on the qualities of a particular site. Manatee County's LDC provides a process for review which takes into account not only an applicant's compliance with conditional use requirements but also input from surrounding property owners. Given that all property owners have constitutional rights, the Court must carefully evaluate the review process. If compatibility with the surrounding area is required, such a factual finding could include subjective elements that could be used to mask improper or unsubstantiated considerations, yet, as the Manatee County LDC is structured, the BOCC retains discretion under its site-specific review to determine whether certain uses are detrimental to a zoning area. *See AT & T Wireless Services of Florida, Inc. v. Orange County*, 23 F.Supp.2d 1355, 1362 (M.D.Fla.1998).

Plaintiff Vertex argues that the findings in Ordinance 09–69 bear little relation to the actual application and request under review, the testimony on the record, and the basis on which the Board denied Plaintiff's application. Plaintiff Vertex argues that Defendant's decision is not based on applicable local regulations, nor is it supported by substantial evidence. Plaintiff Vertex states that, once the public hearing portion of the hearing of 12/3/2009 concluded, an immediate motion was made and seconded to deny the application, without any articulated basis for denial.

To the extent that Plaintiff Vertex is arguing that Defendant's decision to deny

Plaintiff's application is tainted by a due process violation in which, for example, the decision to deny Plaintiff's application was made before the presentation of evidence, or based on some general objection to the presence of telecommunication towers, the Court finds that the record does not support such an objection. The Court notes that, after deliberations, the BOCC did articulate a basis for its decision which was related to the specific planned development under consideration. The Court also notes that Plaintiff Vertex does not argue that the decision to deny Plaintiff's application completely prohibits T–Mobile South, LLC from providing service in the applicable coverage area. The deck was not stacked against Plaintiff Vertex.

VI. Evidence Presented at December 3, 2009, Public Hearing

In considering the evidence presented at the 12/03/2009 public hearing, the Court will cite to evidence contained within the record according to the exhibit letter and corresponding number contained within the Index of Record (Dkt. 13) filed with this Court.

1. Photo Simulation

On December 3, 2009, the Manatee County BOCC held a public hearing to address a myriad of issues, one of which was Vertex's application for a cell phone tower to be constructed within the River Club Community in Manatee County. The BOCC heard testimony from several residents, and also received into evidence slide shows, coverage maps, graphs, photos of other cell towers, a photo simulation of the tower's effects within River Club, and a video presentation by a River Club resident. While the BOCC may have relied upon other evidence within the record that this Court will not address in this order, in addition to the evidence addressed below, the evidence as set forth below comprises substantial evidence to support the BOCC's conclusions in adopting Ordinance 09–69 denying Plaintiff Vertex's application for a telecommunications tower.

During Plaintiff Vertex's presentation to the BOCC at the December 3, 2009, public hearing, Plaintiff Vertex offered a photo simulation analysis of the proposed telecommunications tower into evidence. The photo simulation depicts the proposed cell tower's visual impact upon the River Club community from various locations. Exhibit B–3 (Dkt. 13) provides a "bird's-eye view" of the River Club Community and provides sixteen different locations within River Club from which photos were taken to illustrate the tower's aesthetic impact on River Club. Exhibit B–4 (Dkt. 13) provides a photo from each of the sixteen locations, each with both a current view and prospective view depicting the aesthetic impact, should the tower be constructed. The prospective view photos have a superimposed 150′ flagpole cell tower at the proposed tower location and each prospective photo illustrates the visual impact of the tower from each designated location. For instance, View One is a photo depicting the compound view, which is a view from the proposed tower's base. View One depicts both the current view without the cell phone tower constructed and a prospective view with the 150′ cell tower in place. View Two is facing Northwest from the intersection of River Club Boulevard and Clubhouse Drive, again depicting both the current view and the view from this location with a superimposed 150′ flagpole cell tower constructed at the proposed location, the River Club Golf Course. All sixteen photos demonstrate the visual impact the proposed flag pole cell tower would have on River Club by demonstrating how the neighborhood vistas would be affected if the cell phone tower is constructed as proposed. View Four facing Northeast from Clubhouse Drive and Oakbrooke Circle and View Six facing South-

east from Spyglass Lane, illustrate the disparity between the existing tree line and the top of the 150' cell tower. When viewing these photographs, it is readily apparent that the 150' flagpole tower far exceeds the height of the next closest structure.

Turning to Ordinance 09–69, it is apparent that the BOCC was concerned with the character and purpose of the district. Finding Five under the heading, Applicable Findings of Fact relevant to the above Land Development Code provision Sec. 704.59, Telecommunications Facilities, states as follows:

> The siting of the 150' foot high telecommunication tower within the River Club Golf Course as depicted in the Preliminary Site Plan application rather than reducing or eliminating visual obtrusiveness as required by Section 704.59(2), LDC, emphasizes the out-of-scale nature of the 150' high structure in relation to the open space vista of the River Club Golf Course. The lack of transition in the step down of height serves to accentuate the visual obtrusiveness of the 150' high structure.

The BOCC was clearly concerned with the height disparity and the effect such a disparity would have on River Club, should the tower be constructed. Exhibit B–3 (Dkt. 13) and B–4 (Dkt. 13) of the River Club photo simulation provide evidence that such a height disparity does in fact exist.

The Eleventh Circuit has determined that aesthetics may constitute a valid basis for denial of a wireless permit *if* substantial evidence of the visual impact of the tower was before the board. *Preferred Sites, LLC v. Troup County,* 296 F.3d 1210, 1219 (11th Cir.2002) (Emphasis in original). In the case *sub judice,* the photo simulation depicting the visual impact of the proposed cell tower on River Club was before the BOCC at the point at which the

BOCC reached its decision to deny Vertex's application, and therefore provides a valid basis for denial of Plaintiff's application. However, the photo simulation is not the only evidence before the BOCC as to the proposed tower's visual impact.

### 2. Residents' Testimony

While the photo simulation establishes the aesthetic impact the cell phone tower would have if constructed, so too does the extensive testimony heard by the BOCC at the December 3, 2009, public hearing. The hearing included the testimony of River Club residents opposing the cell tower, including the testimony of two real estate brokers. In addition to the testimony given at the public hearing, the record also includes letters and e-mails from River Club residents opposing the cell tower on similar grounds. Exhibit A–7 (Dkt. 13) was offered by the Manatee County Staff during the public hearing, and contains copies of e-mails and letters from River Club residents in both support of and opposition to the proposed cell tower within River Club. While there are some letters and e-mails that support the cell phone tower's construction, the majority of the letters and e-mails are in opposition, as discussed below.

An e-mail from Cheryl McGrew dated March 3, 2008, opposes the tower construction. Ms. McGrew's e-mail states, "We have an elementary school as well as a middle school where children bike, walk, and are bused to everyday." Ms. McGrew goes on to state, "I am very concerned about the possible health risks." An e-mail from Margie Danahy states, "Because of it's size and the unknown possibilities of radiation coming from the tower, I feel it is inappropriate for an area that is close to schools and homes." An e-mail from Abdul and Sandra Abdulla states, "We are against putting a cell tower at the golf

course in the middle of a residential community that is near two public school as well as preserve areas." An e-mail from David Lunkes opposing the tower states, "Braden River Elementary and Middle School are within a half mile of the proposed tower." An e-mail from Maria Sciame states, "I am a resident of this community and send my child to Braden River Elementary, a school in close proximity to the proposed tower. As a mother and a health care professional, I am very concerned regarding the lack of data on the long-term health effects ..." An e-mail from Bill Rempe states, "[t]he Mount Shasta Bioregional Ecology Center in California studies on Cell Phone Tower health effects have shown that 'even at low level there is evidence of damage to cell tissue and DNA ...'". An e-mail from Marie Reeve states, "[b]eing located so close to schools and residences poses potential health risks." A letter from Marilyn Peters when referencing the cell tower states, "It would pose potential health risks of particular concern because of the two schools that are close to the tower site." A letter from Madeline Schindel when referencing the cell tower states, "It would pose potential health risks of particular concern because of the two schools that are close to the tower site." An e-mail from Donna O. Hedrick states, "This tower is very close to my home. Currently, when I sit on my lanai, I see a preserve with trees, birds and blue sky. If this project goes forward, my view will then include a 160 foot cell tower. It just doesn't fit. Please say no." An e-mail from Alex Troise states, "When I purchased my home in 2007, I purposely selected a location in which the aesthetics of the surrounding area would remain constant." Upon review of these selected resident's concerns, it is clear that the River Club residents are concerned not only with the aesthetic impact the proposed cell tower would have, but also with safety risks posed by the tower's proximity to the local schools.

▮ Generalized aesthetic concerns do not justify the denial of a permit. *New Par v. City of Saginaw*, 301 F.3d 390, 398 (6th Cir.2002); *Southwestern Bell Mobile Systems, Inc. v. Todd*, 244 F.3d 51 (1st Cir.2003); *Omnipoint Corp. v. Zoning Hearing Bd.*, 181 F.3d 403, 409 (3d Cir. 1999). A blanket aesthetic objection does not constitute substantial evidence under Sec 332. *See Preferred Sites*, 296 F.3d at 1219. However, aesthetic concerns may be a valid basis for denial if substantial evidence of the visual impact of the tower is before the Board. *Id.* at 1219. When evidence specifically focused on the adverse visual impact of the 120' tower at a church site surrounded by homes and included opposition of 50 residents due to views and simulated photographs of how the tower would look from the homes, more than a mere scintilla of evidence exist[ed]. *Voice Stream PCS I, LLC, d/b/a T-Mobile v. City of Hillsboro*, 301 F.Supp.2d 1251, 1258 (D. Oregon 2004). ("[If a zoning board] denies a permit based on the *reasonably-founded* concerns of the community then there is 'substantial evidence' ".) *Petersburg Cellular P'ship v. Bd. of Supervisors of Nottoway County*, 205 F.3d 688, 695 (4th Cir.2000). The Fourth Circuit has previously held that, "[t]he repeated and widespread opposition of a majority of the citizens .... who voiced their views-at the Planning Commission hearing, through petitions, through letters, and at the City Council meeting-amounts to far more than a 'mere scintilla' of evidence to persuade a reasonable mind to oppose the application." *AT & T Wireless PCS, Inc. v. City Council of City of Virginia Beach*, 155 F.3d 423, 431 (4 th Cir.1998).

In addition to the photo simulation and letters and e-mails (A–7, Dkt. 13) before the BOCC, several residents spoke at the

December 3, 2009, public hearing. River Club resident Diane Izzo spoke in support of the tower. Ms. Izzo testified that the golf course's use would not be changed by the tower and there exists no legitimate reason to deny Vertex's application (Hearing p. 63–66). The remaining testimony given at the public hearing was in opposition to the cell tower.

River Club resident Emanuel Alex Troise testified that if the tower were to be constructed it would appear to be coming out of the top of his roof. (Dkt. 17–2, p. 66–71). River Club resident David Lunkes testified that the tower would negatively affect the aesthetics of the neighborhood and further that, had the tower been present earlier, his view and his son's view of a lunar eclipse would have been inhibited. (Dkt. 17–2, p. 77–82). River Club resident Michael Murphy detailed how the tower would dwarf his view of the two-story golf course clubhouse and the mature oaks trees visible from his backyard (Dkt. 17–3, p. 108–116). River Club resident Karen Murphy, a professional NICP Planner, testified that River Club's special sense of place has been accomplished through thoughtful design and aesthetic layout. She further opined that the location of the cell phone tower would severely alter the character of River Club. (Dkt. 17–3, p. 128–135). River Club resident Elizabeth Laboune, a financial planner, testified to the economic impacts of cell towers on community property values. (Dkt. 17–3, p. 139–145).

The Eleventh Circuit has held that a resident realtor's testimony concerning the cell sites negative impact on real estate values and proximity to local middle school was substantial evidence. *American Tower LP v. City of Huntsville*, 295 F.3d 1203, 1208–1209 (11th Cir.2002). In *American Tower*, American Tower LP applied to the Board of Zoning Adjustments ("BZA") of the City of Huntsville for a special excep-

tion and variance for the proposed tower property. *Id.* at 1206. The BZA heard testimony from several residents on the negative impact of the proposed tower on aesthetics and property values. For example, the BZA heard testimony from a local resident who testified that she was a realtor and investor in real estate. She said that, in her 16–year experience as a realtor, once the proposed tower was known in the residential neighborhood, it had made it harder to sell houses in the neighborhood, devaluating the property and hurting the neighborhood. *Id.* at 1208. In addition, the BZA heard testimony on safety questions tied to the proposed tower's unusual proximity to two schools and several soccer fields used by children. *Id.* at 1208–1209. The Eleventh Circuit ultimately held that the BZA's decision was supported by substantial evidence. *Id.* at 1208.

■ This Court finds that the photo simulation, letters and e-mails from residents, and testimony given by residents at the public hearing, establishes substantial evidence of the visual impact that the cellular phone tower would have upon River Club. While there may be other evidence within the record, or other reasoning upon which the BOCC has relied, only a single ground for denial of an application for a permit is required. If any one ground provided by the local government is supported by substantial evidence, the denial is proper. *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 495 (2nd Cir.1999). "Nothing in the Telecommunications Act forbids local authorities from applying general and nondiscriminatory standards derived from their zoning codes, and ... aesthetic harmony is a prominent goal underlying almost every such code." *VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818, 831 (7th Cir.

2003) (quoting *Aegerter v. City of Dela-field,* 174 F.3d 886, 891 (7th Cir.1999)).

The Court notes the analysis in *Omnipoint Communications, Inc. v. City of White Plains,* 430 F.3d 529 (2nd Cir.2005). In *Omnipoint,* land was leased on a golf course bordering a residential neighborhood in hopes of constructing a one hundred and fifty foot (150') tower disguised as an evergreen tree. *Id.* at 530. At the public hearing to determine whether a special exception permit from the City of White Plains should be issued, the City heard evidence that the tallest evergreen tree was fifty one feet (51') and the deciduous trees would further reveal the tower disguised as an evergreen tree during the winter months. *Id.* at 533. Based on these facts, the Court found that the City's Zoning Board could reasonably conclude (given express testimony to that effect) that the rower would be widely visible. *Id.* In addition, the Board received substantial evidence of the tower's adverse aesthetic impact. The Court had no difficulty concluding that the Board's rejection was based on reasonable and substantial evidence. *Id.*: "[W]e conclude that the Board has discretion to rely (as it did) on aesthetic objections raised by neighbors who know the local terrain and the sight-lines of their own homes." *Id.* at 534. While the tower proposed to by built by Vertex is not disguised as an evergreen tree, River Club residents have raised objections and concerns as to how the presence of a cell tower will have a negative aesthetic impact on their individual homes and their community as a whole. *AT & T Wireless PCS, Inc., supra.* The Court also notes that, in addition to the letters and e-mails, and the testimony given at the public hearing, the record includes a petition signed by River Club residents.

The Court also notes the analysis in *Michael Linet, Inc. v. Village of Wellington, Fla.,* 408 F.3d 757 (11th Cir.2005). In *Michael Linet,* Linet proposed building a 120 foot flagpole with a cellular communications antenna concealed inside. *Id.* at 760. Linet's proposal was not well received by the Village before constructing the pole. The residents' primary concern, voiced at a June 2003 meeting, was the impact the pole would have on the value of their property. *Id.* Residents testified that they would not have purchased their homes if the pole was present, and a local realtor testified the pole would adversely impact home resale values. *Id.* Another ancillary concern included the impact the pole might have in regard to its proximity to a middle school. *Id.* The Eleventh Circuit concluded that the district court held correctly that the Village's decision to deny Linet's permit was based on substantial evidence received at the June 2003 hearing. *Id.* at 762.

### 3. Property Values

After evaluating the evidence in the this case based on standards established by the Eleventh Circuit, the Court finds that substantial evidence supporting the denial of Plaintiff Vertex's application is present. Although Plaintiff Vertex avers that the BOCC did not take property values into consideration, the record indicates that not only was such evidence before the BCCC, but also that the BOCC was instructed by Deputy County Attorney Robert Eschenfelder that property values may factor into the BOCC's decision-making process:

> MR. ESCHENFELDER: To follow up on an earlier question about the property value situation, and clarify with Ms. Schenik, while it's the recommendation that this factor not be put into the Land Development Code, there are many Federal Court opinions that do indicate that a governing body can consider lowering the property values when looking at a cell tower installation,

One of the key things that you would have to keep in mind though is, did the evidence that you hear today provide you with any factual evidence, as to property values in this particular neighborhood, as opposed to a more generic assertion that simply because towers are towers that they'll make—they make everybody's property value go down.

Did any real estate expert, or whatnot, testify that I have done a study in this particular neighborhood, and it is my expert opinion, as a realtor, that if the tower is put in that the property value would go down. That's the kind of evidence that you would want to look to, not more generic statements. It's riskier, I think, is what Ms. Schenik would tell you, and I would agree, to hang your hat solely on property values if you haven't heard any testimony about this particular neighborhood. Thank you.

(Dkt. 17–4, p. 217–18). The recommendation to the BOCC by Mr. Eschenfelder was a reflection of the established standard within the Eleventh Circuit. "No provision in the TCA forbids local governments from considering compliance with substantial federal regulations in deciding whether to grant or deny tower permits." *Southeast Towers, LLC v. Pickens County, Ga.*, 625 F.Supp.2d 1293, 1302 (M.D.Ga. 2008).

The Court has carefully examined the record in this case. While there is evidence that the proposed cell tower would have no impact on the residential property values, there is also evidence that a cell tower would have a negative impact on residential property values. Patricia Petruff, Esq., on behalf of River Club Homeowners Association, appeared and offered evidence at the hearing of 12/3/2009. During her presentation to the BOCC, Ms. Petruff submitted three articles to the county clerk. (Ex. C–1, MC0818–MC0864). These articles were before the BOCC prior to the BOCC's adoption of Ordinance 09–69. Review of the video from the public hearing (E–1, Dkt. 13, Part 2 at 11:00) establishes the testimony of Patricia Petruff and her submission of articles pertaining to the diminution of property values due to cellular towers.

The articles submitted to the Clerk are the evidence, and speak for themselves. At the hearing, Ms. Petruff made a presentation to the BOCC based on the content of the articles. According to the testimony of Ms. Petruff during the public hearing before the BOCC, the first article, titled "Effect of Distance to Cell Phone Towers to House Prices in Florida", was a peer-reviewed article. Ms. Petruff testified that the article states: "Results of research show that prices of properties decrease by just over two percent on average after a tower [i]s built." The second article Ms. Petruff discussed was the article titled "Impact of Cellular Phone Based Station Towers on Property Values," which Ms. Petruff testified states that visual effects can still pose concern to residents. The third and final article about which Ms. Petra testified was titled "Impact of Wireless Towers on Residential Property Values." Ms. Petruff testified that the conclusion of this article is that proximity to a wireless tower needs to be considered as a negative amenity that may reduce property valuation. Based on the articles submitted to the Clerk by Ms. Petruff, as well as evidence offered by Plaintiff Vertex, there was evidence of the proposed tower's effect on property values, and evidence of the lack of effect the tower would have on property values, which was to be weighed by the BOCC, not this Court.

At the public hearing, two real estate professionals voiced their opposition to the tower, including David Di Girolamo's direct testimony, and the affidavit of Kathleen Schaefer, submitted to the BOCC by River Club resident Gerald Allen, who

spoke during the December 3, 2009, public hearing.

Licensed real estate agent David Di Girolamo testified at the December 3, 2009, hearing. Mr. Di Girolamo has been a River Club resident for eight years and is a Florida licensed real estate broker who testified that he has previously sold properties within River Club. (Dkt. 13, Exhibit E-1, Disk 1, Part 2, at 57:00). The crux of Mr. Di Girolamo's testimony concerned a potential buyer's demand for views, especially in upscale communities such as River Club. Mr. Di Girolamo testified that buyers in upscale communities typically know what they want and pay particular attention to the property views. While the demand of views differs depending on the individual desires of a potential buyer, as some may want waterfront, privacy of preserve, or a golf course, the demand and consequently the value is about equal (Dkt. 17-2, p. 40). Homes with power lines in the back yard, or another home invading the privacy of another, or the presence of a commercial property, significantly decrease the demand and value of a property. Mr, Di Girolamo then specifically addressed the impact of cell phone towers and stated that potential buyers have perceived concerns about health risks, and thus if you can see the tower it will drive down the demand and the value. As the focal point of River Club is the golf course, Mr. Di Girolamo testified that, even if the cell tower is not close to a property, the cell tower will still affect the property value, as [one] drive[s] down River Club Boulevard along tree lined streets and suddenly observe[s] a cell tower which appears out of place. At the conclusion of his testimony, Mr. Di Girolamo stated that, if he knew a cell tower would be constructed within River Club, he would never have purchased his home within River Club.

The second real estate professional, who provided a sworn affidavit, was Kathleen Schaefer. (Exhibit C-13). Ms. Schaefer's affidavit provides:

My name is Kathleen Schaefer. I live at 10317 Baltusrol Place in River Club. I have been a resident of East County for almost 13 years. I purchased a home in River Club in 2000. Both Homes are in very close proximity to the River Club Golf Course House.

For the past 10 years I have bought and sold investment properties in Manatee County for my own company. I currently own 5 of those properties consisting of 7 units and I rent them on an annual and seasonal basis. I have been a licensed Real Estate Agent in the state of Florida since 2005, and I am currently working for Exit Realty Signature Properties in Lakewood Ranch.

Instead of going on and on with numbers and figures that can all be manipulated and refuted depending on which side you are on I would like to speak to you about the perception of the buyer.

River Club, Braden Woods, Braden Pines, and the Sanctuary are neighborhoods where families purchase homes to live in. It is not an area of investment properties.

When families are shopping for their perfect home, perception of the neighborhood homes and people are paramount. Some will argue that a cell tower will change nothing. With my own personal feeling aside, purely based on market condition, I strongly disagree.

Our market works off a numbers game like any other business. You need "X" amount of customers to come through your store for one to make a purchase.

Currently, on average for every 10 showings you should have one contract. Due to current market conditions that number can fluctuate by neighborhood and condition of the house, but that is

basically what we are seeing in a sought after family neighborhood.

Here is where perception comes in. For me to get a contract on a home in close proximity to said cell tower, I need to bring through the door, 10 families who have no objection to a cell tower. The chance of me doing that on the first 10, is next to impossible. So lets say the first 5 don't care about the cell, and the next 5 people do.

That means I need to find 5 more people who don't care about the existence of the cell tower to come through that door in order to secure a contract. Using those numbers. I have to bring a minimum of 15 people through the door to get a contract.

Now that may sound like no big deal, however lets consider the current market conditions. Most people are selling because they have to, not because they want to. The available inventory is huge. If a home is selling on a short sale the price is already pretty low. If it is a bank owned, anything can happen on the pricing depending on how badly the bank needs to be ride of that property. On top of that by increasing the number of buyer who need to see the property you are increasing the time on the market. Depending on the seller, at some point he will have to lower the price to bring more buyers through at a quicker pace.

Throw in a cell tower and now every buyer has cause to begin negotiations lower. Whether they care if the tower is there or not, it becomes a negotiating tool. If it was a buyers agent I would definitely use it to my advantage and IT IS A BUYERS MARKET!

You may say that is my opinion, however, I use a Short Sale negotiator to negotiate with the banks of behalf of my short sellers. Last month an incredibly low offer was submitted to a bank for approval on the short sale. They could not get the bank to accept it, so the buyer's realtor went out to the property and took a picture of a cell tower within blocks of the home. They submitted the photo to the bank and immediately the negotiations stopped and the bank accepted the offer. Why, because they know what a negative perception of a property can do to the sale of the home and they needed to secure the buyer to get that property off their books.

Greenbrook currently has in excess of 100 homes in foreclosure. Summerfield, Riverwalk and Lakewood Ranch Country Club have their own share of foreclosures and short sales as well.

Over the weekend a local paper printed an article about the struggles of the existing residents in Lakewood Ranch due to these distressed properties. The maintenance fees have to be paid by someone, or the residents that are left will either lose amenities or have to come up with the funds. Not to mention living near these unkept homes, which once again ruins the perception of a potential buyer. It is a downward spiral. By allowing the tower in a residential neighborhood in the East County you are opening the door for future installations of towers in all these ailing communities and the impact to perception and pricing would be devastating.

We are surrounded by an incredible number of ailing commercial properties that would give anything for the extra income. Some within less than a mile of our homes. This money could held the businesses and preserve the residential areas. Why are those areas not in the forefront of potential sites? The impact would be considerably less to local residential real estate market.

Make no mistake we are a long way out of this down market. Unemployment is rising putting more pressure on people

to sell their homes. Along with that the FDIC has closed 124 banks across the country. From what I can find, at least 12 were in Sarasota/Bradenton area. All of those banks closed primarily because of defaulting residential real estate loans. The real estate has been absorbed by the government and will have to be released into the market at some point. Contrary to what you see on television many of the large brokerage firms have analysts following this trend and in the opinion of these professionals the future real estate market is not looking bright. When these properties are released from the gov't the stress on the pricing will be incredible. Considering Lakewood Ranch was a tremendous part of the building boom. How many of these houses are included in the gov't portfolio? We do not need a structure such as a cell tower to put any additional pressure on the current market prices. The market cannot handle it.

I would not have purchased my home if the Cell Tower was then existing in River Club because of its adverse effect on the marketability and resale value of my River Club home.

(Dkt. 13, C–13).

As previously cited, the Eleventh Circuit has held that aesthetic objections coupled with evidence of an adverse impact on property values or safety concerns can constitute substantial evidence. *See American Tower LP, supra,* Ms. Petruff testified as to the proposed tower's negative impact on property values, submitting to the clerk three articles relating to the effects of a cell phone tower and property values. Further, Mr. Di Girolamo testified that, in his experience as a licensed Florida real estate broker, cell phone towers decrease both a property's demand and value. Finally, Ms. Schaefer provided an affidavit outlining the current market conditions and, in her opinion, the additional pressure that would be on the market if a cell tower was constructed is something the market simply cannot handle. River Club residents also voiced an overwhelming opposition due to the tower's aesthetic impact as noted above. All of this evidence was available and before the BOCC at the time the BOCC adopted Ordinance 09–69 denying Plaintiff Vertex's application for a cell phone tower.

The Court finds that the aesthetic objections to the cell tower, coupled with evidence of the negative impact of the proposed cell tower on property values, constitute substantial evidence within the written record to support the BOCC's denial of Plaintiff's application. Section 1, Findings of Fact, D., within Ordinance No. 09–69 states, "Based upon the evidence submitted into the public hearing record of the Planning Commission and the Board of County Commissioners, the Board of County Commissioners finds that the conditional use request does not comply with the criteria in Section 704.59 of the Land Development Code." (See additional findings of fact cited above).

### 4. Alternative Sites

Aside from aesthetics and property values, the BOCC also took issue with the lack of evidence to demonstrate why other sites, which are already developed as non-residential, were not considered. Finding of Fact No. 6 states "The public hearing record does not sufficiently document the analysis by the applicant to demonstrate why other sites which are already developed as non-residential, commercial and industrial uses and which are currently visually impacted by tall structures could not be utilized for the telecommunication tower siting in this instance so as to require the location of the 150′ high telecommunication tower on the Property, in reference to Section 704.59(3), LDC."

During Plaintiff Vertex's presentation at the public hearing, Mr. Shon Sparks testified regarding the cell phone tower's proposed location. (E–1, Dkt. 13, Part 2 at 11:00). Mr. Sparks is a radio frequency engineer and gave testimony regarding T–Mobile's coverage objective. Two coverage maps, Exhibit B–9 and Exhibit B–10 (Dkt. 13), were submitted into the record depicting the level of coverage available with a tower located at State Road 70 ("SR–70") and at Vertex's proposed location within River Club. Exhibit B–11 (Dkt. 13) was also submitted into the record, depicting a "bird's-eye view" of other locations considered by T–Mobile, including a location at SR–70. Exhibit B–12 (Dkt. 13) is a coverage comparison between the River Club site and a SR–70 location. While Exhibit B–10 and Exhibit B–9 use a coverage level of—76dBm, the coverage comparison in Exhibit B–12 is a coverage level of—84dBm.

On behalf of Plaintiff Vertex, Mr. Sparks testified that a tower located at SR–70 does not support T–Mobile's coverage objective. (Dkt. 17–1, p. 25–29). Mr. Sparks did not testify that a tower could not be placed at SR–70, but only that a tower at SR–70 would not support T–Mobile's coverage objective. When examining the coverage comparison contained within Exhibit B–12, the population count covered at—84dBm with a site at SR–70 would be 8,090.62 and the population count covered at the candidate site would be 10,596.33. The difference between the candidate site and a site at SR–70 is a population count of 2,505.71. As all these exhibits were made part of the record and were before the BOCC, substantial evidence exists that T–Mobile may reduce their current coverage gap by using an alternative site and has likely chosen River club as an optimal location.

Arthur Peters is a registered professional engineer in Florida, and testified after reviewing testimony and comments regarding the cell tower's proposed location. (Dkt. 17–3, p. 121–25). Mr. Peters testified that he has designed cellular systems around the world and within the United States. The crux of Mr. Peters' testimony was that other potential sites exist besides the candidate site located within River Club. Mr. Peters testified that when viewing Exhibit B–9 and B–10, the areas not shaded do not indicate that no cellular coverage is available in these areas, and that in some of the non-shaded areas, the cellular signal would be strong enough to penetrate buildings. Mr. Peters further testified that the signal found within the shaded areas produces nearly 100% reception, and that the signals found in the non-shaded areas are still very high. Mr. Peters opined that it would make more sense to place a tower to the North and South of River Club, which would provide better coverage in some of the gapped areas as compared to the single candidate location. Mr. Spark's and Mr. Peter's testimony was before the BOCC. The weight the BOCC chose to give to either engineer's testimony is not a consideration properly before this court.

### 5. Conclusion

After consideration of the entire record, the Court concludes that Defendant Manatee County is entitled to judgment as a matter of law pursuant to Fed. R.Civ.P. 56(c). This Court has considered only whether or not substantial evidence is present to support the decision of Defendant Manatee County. The photo simulation, residents' testimony, property value evidence, and testimony concerning alternative cell phone tower sites constitute substantial evidence within the record upon which the BOCC was entitled to base the BOCC s decision. The Court finds that there is substantial evidence contained within the record sup-

porting the BOCC's adoption of Ordinance 09–69 for all the reasons set forth above. Accordingly, it is

**ORDERED** that Defendant's Motion for Summary Judgment (Dkt. 20) is **granted,** and Plaintiff's Motion for Summary Judgment is **denied.** The Clerk of Court shall enter a final judgment in favor of Defendant Manatee County, and against Plaintiff Vertex Development, LLC, and close this case.